# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION


In Re: BILLY JASON HARWELL,

    **Debtor.**

_____/

LYNN H. MARTINEZ,
Chapter 7 Trustee,

    **Appellant,**

v.                                  **Case No. 8:09-cv-703-T-30**

STEVEN D. HUTTON and
STEVEN D. HUTTON, P.L.,

    **Appellees.**

_____/

## ORDER

THIS CAUSE comes before the Court on appeal from the Bankruptcy Court's granting of summary final judgment in favor of Steven D. Hutton and his law firm, Steven D. Hutton, P.L. (hereinafter referred to as "Hutton" or "Defendants"), as to the Trustee's causes of action for fraudulent transfer, aiding and abetting fraudulent transfer, and civil conspiracy to commit fraudulent transfer.

The facts of this case are undisputed. The Bankruptcy Court's summary judgment concerned questions of law which this Court reviews *de novo*. Gray v. Manklow (In re Optical Techs., Inc.), 246 F.3d 1332 (11th Cir. 2001). The main issue before the Court is whether Hutton and his law firm are "initial transferees" under Sections 548 and 550 of the

Bankruptcy Code. 11 U.S.C. §§548 and 550. Two other issues are whether Defendants have liability for aiding and abetting a fraudulent transfer or for civil conspiracy to commit a fraudulent transfer. The Bankruptcy Court ruled Defendants were not "initial transferees" and, further, were not liable under either of the other theories. Because this Court agrees, the Bankruptcy Court's summary judgment will be affirmed.

## BACKGROUND[1]

On July 12, 2005, Thomas Clay Hill (hereinafter referred to as "Hill") obtained a judgment against Billy Jason Harwell (hereinafter referred to as "Debtor") in the amount of $1,396,076.53. When the Hill judgment was entered, Debtor was a ten percent (10%) shareholder in Center for Endoscopy, Inc. ("CFE") and a twenty-five percent (25%) shareholder in Sarasota Endo Investors, LLC ("SEI"). Hutton represented Debtor in connection with a dispute over Debtor's ownership interest in SEI and CFE.

On July 27, 2005, Hill began proceedings to domesticate his judgment in Florida. Debtor hired Hutton to defend him with respect to the domestication proceedings.

On August 11, 2005, Debtor entered into a settlement agreement with SEI and CFE which provided that Debtor would receive:

(a)     $100,000 in cash from CFE within 20 days of the settlement agreement in exchange for his interest in CFE;

(b)     $400,000 in cash from SEI within 30 days of the settlement agreement in exchange for his interest in SEI; and

---

[1] Since the facts are essentially undisputed, the Court has taken the facts from Appellant's brief.

(c)     $46,837.00 promissory note from SEI to satisfy obligations owed to the Debtor
        and as a return of capital.

On August 26, 2005, Debtor answered post-judgment interrogatories from Hill, but
did not disclose the settlement or information about the funds he would receive from it.
Notably, Hutton played no part in answering the interrogatories. On September 1, 2005, the
first $100,000 payment was made from CFE directly to Hutton's trust account. That same
day, at Debtor's direction and with knowledge of Hill's judgment and attempts to collect,
Hutton distributed the funds in five checks as follows:

| No. | Amount | Payee |
|-----|--------|-------|
| 944 | $35,000.00 | Debtor |
| 945 | $25,000.00 | Debtor |
| 946 | $ 5,000.00 | Christine A. Harwell, Debtor's wife |
| 947 | $25,000.00 | ASC Partners |
| 948 | $10,000.00 | Steven D. Hutton, P.L. Trust Account |

On September 6, 2005, Hutton wrote a letter to counsel for SEI directing him to make
the payment on the promissory note in the amount of $46,837.00 to Debtor's wife, Christine
Harwell. On September 9, 2005, SEI remitted its settlement payment of $400,000 directly
to Hutton's trust account. That same day, and at Debtor's direction, Hutton distributed the
$400,000 in the form of seventeen checks as follows:

| No. | Amount | Payee |
|-----|--------|-------|
| 962 | $75,000.00 | Debtor |
| 963 | $33,700.00 | Christine A. Harwell, Debtor's wife |
| 964 | $12,500.00 | Performance Trailers |
| 965 | $17,000.00 | VRS Inc. |
| 966 | $20,000.00 | Ken Johnson |

| 967 | $21,000.00 | Commerce Bank |
| 968 | $10,500.00 | Superior Trailers |
| 969 | $ 9,500.00 | Beneficial Finance |
| 970 | $15,000.00 | Stinar, Zendejas LLC |
| 971 | $50,000.00 | Debtor |
| 972 | $ 6,000.00 | MBNA |
| 973 | $ 4,600.00 | CitiFinancial |
| 974 | $50,000.00 | ASC Partners |
| 975 | $15,917.00 | Delbert Myers |
| 976 | $12,847.00 | Michael Miniat |
| 977 | $27,000.00 | Vintage Motors |
| 978 | $19,436.00 | Billy C. Harwell, Debtor's father |

After the checks were written, but before they cleared, Hill obtained a turnover order from the state court requiring Debtor to turn over any payments received from SEI. The order required Debtor to deliver to Hill any funds received after July 12, 2005, that were still within Debtor's control.

On September 19, 2005, Hutton was served with a writ of garnishment for any amounts held in trust for Debtor. In response, Hutton stopped payment on the two checks issued to Debtor totaling $125,000, but not other checks that had not yet cleared. Hutton, as garnishee, and Debtor moved to quash the writ of garnishment based on a defective domestication. On September 28, 2005, the Florida state court quashed the writ of garnishment. Immediately after the hearing, Hutton, having no knowledge of the Colorado turnover order, issued a check for the remaining $125,000 to the Bank of Commerce. Hutton personally delivered the check to the Bank of Commerce and obtained seven cashier's checks payable as follows:

| No. | Amount | Payee |
|-----|--------|-------|
| 6988 | $15,000.00 | Robert Duitch, the Debtor's bankruptcy attorney |
| 6989 | $ 7,500.00 | American Express |
| 6990 | $30,000.00 | Billy C. Harwell, Debtor's father |
| 6991 | $30,062.96 | Christine A. Harwell, Debtor's wife |
| 6992 | $ 9,500.00 | IRS |
| 6993 | $30,000.00 | Montana Tractor, Inc. |
| 6994 | $ 3,000.00 | J. Lichlyter |

Hutton acknowledged that he obtained the cashier's checks to make sure the money was out of his trust account in case Hill served him with another writ of garnishment.

On October 10, 2005, Debtor filed for Chapter 11 bankruptcy. Post-petition, Hutton assisted Debtor in converting one of the cashier's checks ($30,000) into a check payable to Debtor.

## DISCUSSION

Congress has empowered a bankruptcy trustee to recover assets that a debtor has transferred to another either to hide the assets or in preference over other creditors. Under 11 U.S.C. §548, a trustee may avoid certain transfers of assets made by a debtor within one year[2] before the date of the filing of the petition. It provides in pertinent part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily --

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on

[2] Section 548 has been amended - now the period is two years for cases commenced on or afer April 26, 2006.

or after the date that such transfer was made or such obligation was incurred, indebted; or

       (B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

       (ii)(I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

       (II)  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

       (III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. §550 allows a trustee to recover for the benefit of the estate a transfer that has been avoided under §548.  It states in pertinent part:

(a)     Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from --

     (1)    the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

     (2)    any immediate or mediate transferee of such initial transferee.

(b)     The trustee may not recover under section (footnote omitted) (a)(2) of this section --

     (1)    a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

     (2)    any immediate or mediate good faith transferee of such transferee.

What appears to be a seemingly simple concept in our Bankruptcy Code has developed into "a somewhat murky area of our jurisprudence."[3]   The difficulty is in determining who or what is an "initial transferee."  Appellant takes the position that an initial transferee is the first person or entity that receives the funds, whether as an agent or otherwise, unless excused from that characterization because it would be inequitable to hold such person or entity liable.  Further, Appellant argues that, because it is an exception based in equity, the entity asserting it must have acted in good faith.

The Bankruptcy Code does not define the term.  Circuit Courts have used different tests to define it in resolving particular factual disputes, but the words used can be slippery.  The Fourth Circuit agrees with Appellant.  <u>See</u> <u>In re Harbour</u>, 845 F.2d 1254 (4th Cir. 1988).  It uses the "mere conduit test" to excuse a good faith recipient of an otherwise avoidable transfer who acts as a mere intermediary and who cannot exercise dominion or control over the transferred property.  It sees this analysis as an equitable exception to transferee liability:

> We look with approval on that line of lower court decisions which recognizes that the initial recipient of funds from a debtor may not always be an "initial transferee" within the meaning of 11 U.S.C. §550(a)(1).  Since, however, the initial recipient is asking the court to ignore the literal meaning of §550(a)(1) on essentially equitable grounds, this party must have acted in "good faith" with respect to the relevant transaction in order to be spared the effects of this code provision.

<u>Harbour</u>, 845 F.2d at 1258.

---

[3] <u>Universal Service Administrative Co. v. Post-Confirmation Committee of Unsecured Creditors of Incomnet Communications (In re Incomnet)</u>, 463 F.3d 1064, 1070 (9th Cir. 2006).

The Second Circuit refers to the test as the "mere conduit test" and at least one district court in that Circuit has referred to it as the "innocent conduit" test:

> We join these other circuits in adopting the "mere conduit" test for determining who is an initial transferee under section 550(a)(1). Footnote 3. Numerous bankruptcy courts, including those in this circuit, have also used a mere conduit test to assess initial transferee status. *See Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.)*, 155 BR 332, 337 (Bankr. SD NY 1993) ("parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees for purposes of [11 U.S.C. §550]"); *In re Moskowitz*, 85 BR 8, 11 (E.D. NY 1988) ("innocent conduit" is not an initial transferee); . . .

Finley, Kumble, Wagner, Heine, Underberg, Manley, Meyerson & Casey v. Alexander & Alexander of New York, Inc., 130 F.3d 52, 58 FN 3 (2d Cir. 1997).

The Seventh Circuit uses a "dominion and control" test. See Bonded Financial Services v. European American Bank, 838 F.2d 890 (7th Cir. 1988). The Ninth Circuit has recently explained its view that the "dominion and control" test of Bonded is actually two separate tests: the dominion test and the control test. Universal Service Administrative Co. v. Post Confirmation Committee of Unsecured Creditors of Incomnet Communications (In re Incomnet), 463 F.3d 1064 (9th Cir. 2006). It describes the dominion test as determining whether a transferee has dominion over the asset, the right to put it to one's own purposes. If the asset is money, for example, the inquiry is whether an entity had legal authority over the money and the right to use the money however it wished. In re Incomnet, 463 F.3d at 1070. It points to Bonded as using the "dominion test." It describes the "control test" as focusing on whether the entity actually controlled the funds or merely served as a conduit, holding money that was in fact controlled by either the transferor or the real transferee. In

re Incomnet, 463 F.3d at 1071. It points to the Eleventh Circuit's decision in Societe Generale[4] as using the "control test." It then says "(a) number of circuits combined these tests - or at least combined their names - creating a 'dominion and control test' to determine whether a party is an initial transferee," citing many examples. See In re Incomnet, 463 F.3d at 1071.

The Ninth Circuit places itself on the "dominion test" side of the ledger and rejects the "control test:"

> Thus, we see that while the two inquiries are similar, they are not indistinguishable: The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. *See Bonded Fin. Servs.*, 838 F.2d at 893-94. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question. *In re Chase & Sanborn Corp.*, 848 F.2d at 1199. Since we have explicitly adopted the "more restrictive 'dominion test,'" set out in *Bonded Financial Services, In re Cohen*, 300 F.3d at 1102 n. 2, we take care not to apply the more lenient "control test" put forth in *In re Chase & Sanborn Corp.*

In re Incomnet, 463 F.3d at 1071. The Ninth Circuit views the dominion test as strongly correlating with legal title. "In In re Cohen,[5] we described '(d)ominion . . . (as) akin to legal control (eg., the right to invest the funds as one chooses)" and distinguished this from "mere possession." In re Incomnet, 463 F.3d at 1073. But the use of the words "legal control" in describing the dominion test exemplifies how slippery this area can be. The Ninth Circuit sees it otherwise, though:

---

[4] Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196 (11th Cir. 1988).

[5] Abele v. Modern Fin. Planned Servs. Inc. (In re Cohen), 300 F.3d 1097 (9th Cir. 2002).

The fact that the dominion test is sometimes stated as an inquiry into who had "legal control" over funds does not mean that the dominion test is the same as the control test. As we have discussed above, the two tests do differ, and when control is used in the context of stating the dominion test, it is merely used in its lay sense.

In re Incomnet, 463 F.3d at 1074, FN 10.

In re Incomnet involved a difficult factual scenario that arose because of the 1996 Telecommunications Act requiring all telecommunication carriers to financially support the cost of providing telecommunications services to schools, libraries, health-care providers, low-income consumers, and subscribers in high-cost areas. Each carrier is required by law to contribute to the Universal Support Fund ("USF") based on its revenues. The carriers pass this cost through to their subscribers, generally appearing on the phone bill as the "Universal Service Fund Fee." Congress gave the Federal Communications Commission ("FCC") the authority to implement the support provisions of the Act. The FCC designated the Universal Service Administrative Company ("USAC"), a non-profit corporation, to collect and disburse the funds. All of USAC's operations are carried out pursuant to regulations promulgated by the FCC. When one of the carriers filed bankruptcy, its trustee sought to avoid its USF contributions for three months, totaling $470,161.52. The Ninth Circuit held that, even though USAC was heavily regulated and had little control over what it could do with the money, it still had legal title to the fund and was therefore an initial transferee. Therefore, the transfer was avoided and the funds (presumably already disbursed to the mandated recipients) were ordered to be returned to the creditors committee of the bankruptcy estate.

The Ninth Circuit views its "dominion test" as more strict, and perhaps even more harsh, than the Eleventh Circuit's "control test." But it views the results from the dominion test to be more predictable - the recipient either has legal title to and the ability to use the asset, or not. While the Ninth Circuit may be correct that its approach yields a more predictable result, it has the drawback of ensnaring some that are in reality only conduits. This is so because of the infinite variety of factual contexts in which conduits may find themselves. See, e.g., Societe Generale[6], Pony Express[7], and Ogden[8].

Not all courts have been persuaded to follow the Ninth Circuit's legalistic approach in its strictest form. See Bear, Stearns Securities Corp. v. Helen Gredd, Chapter 11 Trustee (In re Manhattan Investment Fund Ltd.), 397 BR 1, 16 (S.D. N.Y. 2007). And, as the Ninth Circuit acknowledged, the Eleventh Circuit prefers taking a broader view to a given factual situation in an effort to stay true to the intent of Congress: "'(t)his system could easily fall of its own weight if courts or scholars become obsessed with hair splitting distinctions' and lose sight of the real purpose of the laws being applied." Societe Generale, 848 F.2d at 1202, citing United States v. Bailey, 444 U.S. 394, 406-07 (1980).

While the various Circuits use different tests, most agree that the leading case on determining who is an "initial transferee" is the Seventh Circuit case of Bonded Financial

---

[6] Nordberg v. Societe Generale (In re Chase and Sanborn Corp.), 848 F.2d 1196 (11th Cir. 1988).

[7] Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express), 440 F.3d 1296 (11th Cir. 2006).

[8] Ogden v. Big Sky Motors, Ltd. (In re Ogden), 314 F.3d 1190 (10th Cir. 2002).

Services v. European American Bank, 838 F.2d 890 (7th Cir. 1988). In Bonded, Michael Ryan controlled a number of currency exchanges. He also owned a horse farm. Ryan had borrowed $655,000 from European American Bank giving his horses as collateral. At Ryan's request, one of the currency exchanges, Bonded Financial Services, sent European American Bank a check for $200,000 made payable to the bank with a note directing the bank to deposit the check into Ryan's account. The bank made the deposit into Ryan's account as instructed. Ten days later, Ryan directed the bank to debit his account for $200,000 and apply it on the outstanding balance of his horse farm loan. The bank did so. Within the following two weeks, Ryan paid off the loan and the bank released its security interest in the horses.

Bonded's trustee contended that the bank was the "initial transferee" under §550(a)(1) because it was the payee of the $200,000 check it received and deposited into Ryan's account. Bonded's trustee argued further that at the very least the bank would be the "entity for whose benefit such transfer was made" because Ryan intended to pay off the loan when he caused Bonded to write the check. The Seventh Circuit ruled that the bank was not the initial transferee:

> Although the Bankruptcy Code does not define "transferee", and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded.

Bonded, 838 F.2d at 893.

The Seventh Circuit explained that even though the bank was the payee, it had acted as a financial intermediary. Under the law of contracts, the bank had to follow the instructions that came with the check. "The bank had no dominion over the $200,000 until January 31st, when Ryan instructed the bank to debit the account to reduce the loan; in the interim, so far as the bank was concerned, Ryan was free to invest the whole $200,000 in lottery tickets or uranium stocks." Bonded, 838 F.2d at 894. The Seventh Circuit did note, however, that if the instructions accompanying the initial $200,000 check had said to apply the check to reduce Ryan's loan, instead of directing that it be deposited into Ryan's account, then the bank would have been the initial transferee.

The Seventh Circuit made another important point in Bonded, one that runs directly contrary to Appellant's position here. Appellant contends that the lawyer in this case, Hutton, was an initial transferee because he did not use good faith in disbursing checks from his trust account. Appellant's argument is that only by showing good faith is an agent or other person who first touches the money excused from being classified as an "initial transferee." To that, the Seventh Circuit said:

> We are aware that some courts say that an agent (or a bank in a case like ours) is an "initial transferee" but that courts may excuse the transferee from repaying using equitable powers. This is misleading. "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent". To treat "transferee" as "anyone who touches the money" and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule.

Bonded, 838 F.2d at 894.

Appellant contends that this language is not fatal to her position because this Court is bound by the law of the Eleventh Circuit, not the Seventh.

## THE LAW OF THE ELEVENTH CIRCUIT

In support of her position, Appellant points to language used by the Eleventh Circuit in IBT International, Inc., Southern California Sunbelt Developers, Inc. v. Northern (In re International Administrative Services, Inc.), 408 F.3d 689, 705 (11th Cir. 2005):

> In order for this exception [the "mere conduit" concept] to apply, then, we must determine whether Givens, Tedder, TIPCO and HAC are merely conduits of the IAS funds, and whether IBT and SCSD are the resulting "initial transferees." As we read it, the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud.

While this language certainly seems to support Appellant's characterization of the Eleventh Circuit's view of this issue (that the mere conduit test is an exception for an initial transferee to meet and may only do so if the actions taken were in good faith), this Court must use care in accepting that argument. First, the above quote was not essential to the Eleventh Circuit's holding in In re International Administrative Services and is therefore *dicta*, and second, the language used by the Eleventh Circuit in other cases indicates it uses the conduit theory to identify whether a potential defendant is an initial transferee within the meaning of §550(a)(1) as opposed to being used as an exception.

The real issue in In re International Administrative Services was whether an action must first be brought against the initial transferee as a prerequisite to seeking recovery against subsequent transferees. The defendants in the case (subsequent transferees in a chain

of multiple transfers used to avoid creditors) argued that the suit against them was premature because the bankruptcy trustee was first required to sue the initial transferee, whomever that might be in the chain. The ultimate holding of the Eleventh Circuit was that when a transfer is avoided, a plaintiff may skip over the initial transferee and recover from those down the line. In re International Administrative Services, 408 F.3d at 706.

International Administrative Services (IAS) was a corporation through which Charles Givens ("Givens") marketed financial advice to unsophisticated consumers through seminars and late night infomercials. Givens was the company's sole shareholder, served as an officer and director (until shortly before its demise), and was its visible spokesperson promoting his own "wealth without risk" plan. IAS began experiencing problems that threatened its existence: several consumers sued alleging losses from bad advice, the SEC launched a fraud investigation, the Attorney Generals of several states began investigations concerning IAS' failure to pay state sales taxes, and the Federal Trade Commission began investigating the company's business practices.

Givens hired David Tedder ("Tedder"), his law firm, and his company, the Institute for Asset & Lawsuit Protection, to help him shield his assets from creditors:

> First, assets were transferred to various Tedder-owned foreign and domestic entities. Tedder then recycled the assets through a tangled and complex web of multi-step international transactions. In total, Tedder transferred assets more than one hundred times among twenty-three different entities. Between January 1992 and 1996, Givens removed a treasure chest in excess of $50 million from IAS coffers; putting it out of the direct reach of IAS' creditors.

In re International Administrative Services, 408 F.3d at 696.  Notably, unlike the case now before this Court, the transfers were not to the lawyer or the lawyer's trust account.  And, there is no mention of how these various corporate entities held the funds they received, whether in their own account or an agency account, nor is there any discussion of the extent of control exercised by these various transferees.

As one result of the multiple transfers, $1,050,000 came to rest in IBT International, Inc. (IBT) and then Southern California Sunbelt Developers, Inc. (SCSD).  IBT and SCSD claimed to be subsequent transferees and defended on the basis that the trustee was required to first pursue the initial transferee or transferees before they could be sued.

Addressing this defense, the Eleventh Circuit explained its use of the "mere conduit test," acknowledged that the prior transferees in the overall scheme did not appear to qualify as "mere conduits," but held that it did not matter because both initial and subsequent transferees are subject to avoidance actions:

> Although this interpretation treats IBT and SCSD as subsequent transferees, the distinction between initial transferee and mediate transferee for avoidance purposes is irrelevant.  The defendants need only be transferees.  In order to incur liability as a transferee, a party must have exercised a degree of dominion and control over the property transferred, or held some sort of beneficial right in it.  In re Paramount Citrus, Inc., 268 B.R. 620 (M.D. Fla. 2001).  Here, IBT and SCSD meet that test.  The defendants received $1.050 million of IAS' money and used it to invest in the Guild property.  Only a controlling entity would be able to do so, and the trustee may recover from the defendants.

> We think this interpretation is correct.  We emphasize that this ruling does not erode the conduit theory.  Rather, it accommodates a case involving a multitude of patently fraudulent transfers.  Not all cases can conveniently be

characterized as involving a "conduit" in order to reach property from later transfers.

In re International Administrative Services, 408 F.3d at 707.

The Eleventh Circuit placed importance on the "degree of dominion and control over the property transferred," but found it unnecessary to examine the details of the earlier transactions to determine which entity first exercised sufficient control over the funds to be deemed the initial transferee. In other cases not involving massive fraud, the Eleventh Circuit has used a more detailed analysis of each transaction to determine which entity first had sufficient control over the funds to be considered the initial transferee.

As previously stated, language from other Eleventh Circuit cases indicates that the Eleventh Circuit uses equitable principles to determine which party is the initial transferee in the first instance, not whether the initial transferee merits an exception from that status. For example, the Eleventh Circuit cites Bonded with favor in determining who is an initial transferee. See Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196 (11th Cir. 1988). Societe Generale was a French bank with a branch office in New York City in which Columbian Coffee had a demand deposit account. Checks drawn on the account were processed through the New York Clearing House system. If there were insufficient funds to cover a check, Societe Generale had until noon the next business day to decide whether to honor or return the check. Societe Generale monitored Columbian Coffee's account closely because it knew it had financial difficulties. When Columbian Coffee had an overdraft, Societe Generale would call to make sure that Columbian Coffee was

depositing sufficient funds to cover it before it would honor the check. Columbian Coffee would tell Societe Generale how much money it was depositing and from which bank the money was coming. Societe Generale, in turn, would contact the sending bank to confirm the information. Only after receiving a confirmation from the sending bank would Societe Generale then honor the check.

A Columbian Coffee check for $1,747,403.00 arrived at the clearing house for payment and created an overdraft situation of $1,033,135.07. Societe Generale checked with Columbian Coffee and was told that two wire transfers were coming from Credit Lyonnais Panama totaling $1,200,000.00 to cover the overdraft. Because of this assurance, Societe Generale authorized the payment of the check before the wire transfer arrived. Columbian Coffee's account was in an overdraft position for one day for which Societe Generale charged Columbian Coffee $351.51 based on a rate on 12.25% per annum.[9]

The next day, as promised, the funds came in to cover the check, $500,000 of which came from a Chase & Sanborn account ("C&S"). About six months later, C&S filed for bankruptcy and its Chapter 11 trustee brought an action against Societe Generale to avoid the transfer as constructively fraudulent.

---

[9] Societe Generale claimed this "charge reflected the costs incurred due to the paper overdraft created when Citibank debited the Societe Generale account. This occurred before Societe Generale had decided whether or not to honor the check and would have been charged regardless of whether it had decided to honor or bounce the check the following day." Societe Generale, 848 F.2d at 1201. The Eleventh Circuit found this explanation persuasive.

The Eleventh Circuit used what it referred to as the "control test" to determine whether Societe Generale gained control over the funds transferred to it so as to be considered an initial transferee. It described the control test as follows:

> The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law. See Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) (noting that "equitable principles govern the exercise of bankruptcy jurisdiction"); In re Chase & Sanborn Corp., 835 F.2d 1341, 1349 (11th Cir. 1988); Coffee II, 75 B.R. at 179-80.

> * * *

> Bankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant's status in light of the entire transaction. And, in the past, courts have refused to allow trustees to recover property from defendants who simply held the property as agents or conduits for one of the real parties to the transaction. Had these courts employed an overly literal interpretation of section 548, they could have allowed the trustees to recover the funds from the defendants. Instead, they determined that, although technically the defendants had received the funds from the debtors and could be termed "initial transferees," the defendants had never actually *controlled* the funds and therefore it would be inequitable to allow recovery against them.

Societe General, 848 F.2d at 1199-1200. The Eleventh Circuit noted its agreement with Bonded that an important factor in considering whether a bank is an initial transferee is whether the bank received the money for its own account or that of the debtor:

> When trustees seek recovery of allegedly fraudulent conveyances from banks, the outcome of the cases turn on whether the bank actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee. Thus, where a bank receives money from a debtor to pay off the debt owed to the bank, courts have found that the bank gained control of the funds and have allowed recovery against the bank.

> (Citations omitted). When banks receive money for the sole purpose of depositing it into a customer's account, on the other hand, the bank never has actual control of the funds and is not a section 550 initial transferee. (Citation omitted). This is true even when, after a bank deposits the money into a customer's account, the customer gives the money to the bank to pay off a debt that it owes to the bank. *See Bonded*, 838 F.2d at 892.

Societe Generale, 848 F.2d at 1200. "Good faith" does not appear to be a criterion in determining whether a bank has "actual control" of funds.

Societe Generale is a good example of how nuanced these cases can be. If the Columbian Coffee overdraft position was deemed to be a debt owed to Societe Generale, then the funds sent to pay off the overdraft would be in the control of Societe Generale and recoverable by the Trustee. But, if it is viewed, not as a debtor-creditor relationship, but as merely Societe Generale receiving funds to credit to the Columbian Coffee account, and Columbian Coffee using the money for its purposes, then Societe Generale would be a mere conduit. The Eleventh Circuit held that, viewing the transaction equitably, Societe Generale merely acted as a conduit, and was not an initial transferee.

In the case presently before this Court, Appellant cites Societe Generale as support for its position that the Eleventh Circuit, looking strongly to principles of equity, requires one to act in good faith before being entitled to an "exception" from liability as an initial transferee. Indeed, some courts in this Circuit have taken a similar view of the Eleventh Circuit's wording. See In re Toy King Distribs., Inc. 256 BR 1, 147 (Bankr. M.D. Fla. 2000) (the mere conduit defense is based on equitable principles and is "intended to protect innocent transferees from liability for avoided transfers received and processed in good

faith."). This is particularly true of courts trying to reconcile the wording of the Eleventh Circuit with that of the Fourth Circuit in <u>In re Harbour</u>, 845 F.2d 1254 (4th Cir. 1988). For example, see <u>Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)</u>, 250 B.R. 776 (Bankr. S.D. Fla. 2000) at 801:

> The "mere conduit" defense immunizes a good faith recipient of an otherwise avoidable transfer who acts as a mere intermediary and who cannot exercise dominion or control over the transferred property, where equitable principles justify such an exception. *See, e.g., Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir. 1987); *In re Harbour*, 845 F.2d 1254, 1257 (4th Cir. 1988) (finding that in order for court to find that initial recipient of transfer was mere conduit and not initial transferee (as defined by § 550(a)(1)), court must find that recipient did not act inequitably or in bad faith). However, a transferee who does not act in good faith can never be deemed a "mere conduit." *See Harbour*, 845 F.2d at 1258.

But the Eleventh Circuit appears to use its "control test" or "mere conduit test" to determine whether an entity is a transferee at all, not whether once one is a transferee, the exercise of good faith can provide an escape. The Eleventh Circuit instructs one to step back and view a transaction as a whole to determine whether the receiving entity was acting on its own behalf, or as an agent or conduit for another. The use of a trust account by a fiduciary is an important factor in this determination, even where the fiduciary, because of the circumstances, may be viewed legalistically as a creditor at the time the funds were actually received. This is well illustrated by the Eleventh Circuit's holding in <u>Societe Generale</u>, <u>supra</u>, and <u>Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express)</u>, 440 F.3d 1296 (11th Cir. 2006), and its citation with favor to <u>In re Ogden</u>, 314 F.3d 1190 (10th Cir. 2002).

Andreini & Co. was the insurance broker for Pony Express. Pony Express wrote a check to Andreini & Co.'s trust account to cover insurance premiums owed to its insurance carriers. Andreini, without waiting for the check to clear, wrote checks from its trust account to pay the premiums to the various insurance carriers. The Pony Express check bounced. Three weeks later, and two days before filing bankruptcy, Pony Express wired transferred funds to Andreini to replace the funds it had advanced from its trust account.

The bankruptcy court and the district court ruled that Andreini was an initial transferee because when it advanced funds, even unintentionally, it legally became a creditor to Pony Express. When the wire transfer was received three weeks later, Pony Express was repaying its debt to Andreini, not the insurance premiums. The Eleventh Circuit acknowledged that interpretation had some initial appeal, but did not "stand up to closer inspection under the control test precedent of this and other circuits." In re Pony Express, 440 F.3d at 1302. Without mentioning "good faith," the Eleventh Circuit explained the use of equity in applying the control test, not as an exception to one already deemed a transferee, but to determine who is a transferee in the first instance:

> The control test "is a very flexible, pragmatic one; . . . courts must look beyond the particular transfers in question to the entire circumstance of the transactions." *Societe Generale*, 848 F.2d at 1199 (internal quotation and citation omitted).

> \* \* \*

> The evidence also indicates that the purpose of the wire transfer was to replace the bad check and reimburse the client trust account with funds for payment of insurance premiums. Thus, as in *Societe Generale*, the avoidable transfer was "earmarked" not as payment of a debt, but as a deposit to a client account

held in trust by the client's fiduciary. Finally, while the deficiency existed for longer than in *Societe Generale*, about three weeks instead of two days, the length of this period should not have dispositive significance. *See Ogden*, 314 F.3d at 1194, 1203-05 (finding that no debt was created and an escrow agent was not the initial transferee of funds transferred to replace those released four to six weeks earlier due to the debtor's fraud). More important to the control test, an inadvertent and temporary deficiency settled with a reasonably prompt wire transfer further indicates that Andreini was merely a conduit for Pony Express' insurance premiums. *See Societe Generale*, 848 F.2d at 1201.

In addition, the actual destination of the wire transfer is significant to determining whether a recipient has sufficient legal control over transferred funds. *See Coutee*, 984 F.2d at 141[10] (finding that a law firm was not an initial transferee where "the funds were deposited into the firm's trust account, as opposed to its business account, indicating that they were held merely in a fiduciary capacity."). At no time were the transferred funds under the unrestricted legal control of Andreini. The funds were wired directly to Andreini's client trust account over which its control was quite limited. Under California law the client account was a trust account with Andreini as fiduciary such that client funds could only be used for the client's purposes, such as paying insurance premiums.

In re Pony Express, 440 F.3d at 1302-1303.[11]

This Court will mention In re Ogden only briefly. It was cited with favor by the Eleventh Circuit in Pony Express. In re Ogden involved a real estate escrow agent that breached its terms of trust by wrongfully paying to Ogden funds belonging to Big Sky.

---

[10] Security First National Bank v. Brunson (In re Coutee), 984 F.2d 138 (5th Cir. 1993).

[11] Judge Hull dissented in In re Pony Express, agreeing with the bankruptcy court and district court that Andreini was in the position of a creditor at the time it received the wire transfer in question and therefore was an initial transferee. The Ninth Circuit would probably have also reached this result. This lack of predictability in result has caused at least one observer, Professor Dan Schechter, Professor of Law at Loyola Law School, Los Angeles, California, to state that "one would hope that the Supreme Court will soon clear up the confusion. All we need is a working (and workable) definition of the word 'transferee.'" 2006 Comm. Fin. News. 71.

Ogden convinced the agent that Big Sky agreed to change the escrow terms. The agent never verified this with Big Sky.

The escrow agent threatened to report Ogden, a developer, to the state if he did not return the money. Ogden obtained money from other investors and repaid the escrow agent. The agent then paid the money to Big Sky because the closing did not take place. Big Sky never knew its money had left the escrow account. Nevertheless, when Ogden subsequently filed bankruptcy, the trustee sought return of the funds as an avoidable preference. Big Sky claimed it was a subsequent transferee entitled to a good faith defense and the escrow agent was the initial transferee. The Tenth Circuit disagreed and held that the escrow agent was a conduit, making Big Sky the initial transferee. Big Sky had to return the money to the trustee money even though what Big Sky thought it had received was its own money. There was no discussion of whether the escrow agent was "innocent" or had used "good faith."

## THE CASE BEFORE THE COURT

Like the insurance broker in <u>In re Pony Express</u>, the lawyer in the instant case received the funds in question as a fiduciary and placed the funds in his trust account to be used for his client's purposes. The Eleventh Circuit has recognized that such fiduciaries are not initial transferees. In <u>In re Pony Express</u>, it cited with approval the Fifth Circuit case of <u>In re Coutee</u> which held that a law firm that placed funds into its escrow account on behalf of its client lacked the requisite dominion required to be an initial transferee. <u>Security First National Bank v. Brunson (In re Coutee)</u>, 984 F.2d 138 (5th Cir. 1993).

In In re Coutee, a plaintiff's personal injury firm, Fuhrer, Flournoy, Hunter & Morton, assisted its clients, the Coutees, financially during pending litigation. The firm arranged for a bank to loan the Coutees money with the firm serving as an unconditional guarantor on the notes. The bank loaned the money based on the credit of the law firm and made no investigation into the creditworthiness of the Coutees. The money loaned by the bank represented amounts which could be ethically advanced to clients by the firm itself under the Louisiana Code of Professional Conduct.

When their case was settled, the Coutees endorsed the check to the firm which then deposited it into its trust account. The firm then paid its fees out of the fund, the bank in full, and the remaining portion to the Coutees. The bank marked the note paid and delivered it to the firm which in turn delivered it to the Coutees. Within ninety days of the payment of the note, the Coutees filed for bankruptcy and the bankruptcy trustee sought to avoid the payment of the note under §547 of the Bankruptcy Code. The bank filed a third party action against the law firm seeking recovery on the unconditional guaranty in the event that the trustee was successful in avoiding the payment of the note.

The Fifth Circuit used the "dominion or control test" to determine which entity was the "initial transferee," citing to, among others, both Bonded and In re Chase & Sanborn Corp., 848 F.2d 1196 (11th Cir. 1988). The Fifth Circuit held that under these facts the bank, not the law firm, was the initial transferee, the payment to the bank could be avoided, and the law firm's status as guarantor restored:

Adopting the dominion or control test, we find that the bank, not the firm, was the initial transferee of the funds. As the district court noted, the funds were deposited into the firm's trust account, as opposed to its business account, indicating that they were held merely in a fiduciary capacity for the Coutees. Moreover, the negotiations regarding the firm's legal fees, which occurred after it received the funds, indicate that the firm was not free at that time simply to keep the money. The only control exercised over the funds was the control delegated to the law firm by the Coutees. As the bankruptcy court noted, "[t]he law firm, under Louisiana law, was required to keep the client's funds in an identifiable trust account in order to avoid the charge of conversion." *See Louisiana State Bar Ass'n v. Gross*, 576 So. 2d 504 (La. 1991).

* * *

Finally, the firm contends that its payment of the note out of its trust account should extinguish its guaranty obligation because it would violate concepts of fairness and equity to require the firm to pay the bank a second time. We have held, however, that the money deposited in the trust account was never the firm's money at all; thus, it never even paid the bank once. It was precisely the risk of the clients' insolvency that the firm assumed when it signed the unconditional guaranty. It cannot now avoid that risk by attempting to convert the transaction into something that it was not.

In re Coutee, 984 F.2d at 141-142.

The reasoning of the Fifth Circuit in In re Coutee has been applied in this district to funds paid into a law firm's trust account. See Lifecare Technologies, Inc. v. Berman Law Firm, P.A. (In re Lifecare Technologies, Inc.), 305 BR 88 (Bankr. M.D. Fla. 2003). There, the bankruptcy court found a law firm was not the initial transferee of funds held in its trust account because it was obligated to disburse the funds in accordance with the instructions from its client and had no discretion regarding how the money could be spent. That reasoning, which is consistent with that of the Eleventh Circuit in In re Pony Express, applies as well to the facts presently before this Court.

Hutton and his law firm received the funds in question on behalf of his client and deposited them into his trust account. He was acting in a fiduciary capacity and was obligated to disburse the funds only in accordance with the instructions from his client. That Hutton disbursed funds as directed, and assisted by personally delivering the checks, does not alter his status as a fiduciary. The funds in the trust account belonged to the client, not the lawyer. Therefore, under the control test of the Eleventh Circuit, Hutton and his law firm were not initial transferees under §550 of the Bankruptcy Code.[12]

## APPELLANT'S OTHER CLAIMS

A.      **Whether Florida recognizes a cause of action for aiding and abetting a fraudulent transfer.**

Appellant contends the Bankruptcy Court erred in ruling that Florida law does not recognize a cause of action for aiding and abetting a fraudulent transfer. The Bankruptcy Court relied on the decision of the Florida Supreme Court in Freeman v. First Nat'l Bank, 865 So. 2d 1272 (Fla. 2004). In Freeman, the Florida Supreme Court said:

> (W)e conclude that FUFTA was not intended to serve as a vehicle by which a creditor may bring a suit against a non-transferee party . . . for monetary damages arising from the non-transferee's party's alleged aiding-abetting of a fraudulent money transfer.

Freeman, 865 So. 2d at 1277. Appellant asserts this holding is inapplicable here because Hutton is a transferee. But, since this Court has ruled that Hutton is not a transferee, this

_____

[12]  Even if "good faith" were to be taken into account, the result would be the same. It is undisputed that Hutton played no part in the false answering of the post- judgment interrogatories and had no knowledge of the Colorado turn over order when he disbursed all funds from his account.

argument fails.[13]  Since Hutton is not a transferee, <u>Freeman</u> is clearly on point and dispositive of this issue.

**B.**     **Whether Florida law recognizes a cause of action for civil conspiracy to commit a fraudulent transfer.**

The essential elements of a civil conspiracy are:

(1)     a conspiracy between two or more parties;

(2)     to do an unlawful act or to do a lawful act by unlawful means;

(3)     the doing of some overt act in pursuance of the conspiracy; and

(4)     damage to plaintiff as a result of the acts done under the conspiracy.

<u>Bankers Life Insurance Co. v. Credit Suissee First Boston Corp.</u>, 590 F. Supp. 2d 1364, 1366 (M.D. Fla. 2008).  An actionable conspiracy requires an underlying tort or wrong.  <u>Border Collie Rescue, Inc. v. Ryan</u>, 418 F. Supp. 2d 1330 (M.D. Fla. 2006).

Appellant argues the Bankruptcy Court erred when it held that Florida law does not recognize a cause of action for civil conspiracy to commit a fraudulent transfer.  The Bankruptcy Court again relied on <u>Freeman</u> in holding that one cannot accomplish through a civil conspiracy theory what one could not accomplish directly through a fraudulent transfer claim.  Appellant contends this is error for two reasons:

(1)     Here, Hutton was a transferee, and

(2)     <u>Freeman</u> limited its holding to the context of FUFTA and did not address whether relief was available under other theories of liability.

---

[13] The funds that Hutton disbursed to himself from his law firm's trust account are not at issue in this case.  The parties have settled that portion of the claim.

Given this Court's ruling that Hutton was not a transferee, Appellant's first contention is without merit.

In support of its second contention, Appellant points to the fact that the Florida Supreme Court in <u>Freeman</u> expressly declined to address whether an action for civil conspiracy may exist noting the dissent in <u>Banc First v. USB Paine Webber, Inc.</u>, 842 So. 2d 155, 157 (Fla. 5th DCA 2003). There, the majority in <u>Banc First</u> held that the Florida Statutes covering fraudulent asset conversion (F.S. § 222.30) and fraudulent transfers (F.S. § 726) did not create a cause of action against a party who allegedly assisted a debtor in such transaction where that party did not come into possession of the property. The dissenting judge disagreed, reasoning that if it is fraud for a debtor to convey assets to avoid creditors, there should be no policy reason to immunize someone who knowingly and willingly makes it possible for the transferor to commit the fraud.

<u>Banc First</u> involved a lawyer who claimed to specialize in "asset preservation." The lawyer assisted his client by forming a trust in the Bahamas to be administered by a bank there with the assistance of Paine Webber in the United States. Substantial assets were transferred from the client's name to the trust. The lawyer also formed a corporation with himself as registered agent for the purpose of managing the client's various investments. The new corporation set up an account with Paine Webber and money was transferred from that account to the trust in the Bahamas. The money and the trust were used to purchase a home

for the client in the United States and to pay his living expenses. The dissent considered these facts sufficient to overcome a motion to dismiss, but the majority ruled otherwise.

Like the Florida Supreme Court, this Court is reluctant to say there is no set of facts under which a party who assists a fraud might be liable under a civil conspiracy theory. For example, had Hutton, the lawyer in this case, assisted Debtor in falsely answering the collection interrogatories, or had he violated the Colorado state court turnover order requiring the debtor to turn over settlement proceeds to the creditor, such an act might well be considered in furtherance of a conspiracy to commit fraud.

In saying that, this Court does not hold that such an action for civil conspiracy exists for aiding a fraudulent transfer. It is not required to reach that issue since there were no "wrongs" committed by the lawyer in this case. This issue is best left for another day, but, at the least, a warning bell has sounded for parties involved in "asset preservation."

## <u>CONCLUSION</u>

Having concluded the Bankruptcy Court correctly ruled that Hutton and his law firm were not "initial transferees" and were not liable under the theories of aiding and abetting a fraudulent transfer or civil conspiracy, the Order of the Bankruptcy Court will be affirmed.

It is therefore ORDERED AND ADJUDGED that:

1.      The Bankruptcy Court's summary final judgment in favor of Steven D. Hutton and his law firm, Steven D. Hutton, P.L., is hereby AFFIRMED.

2.     The Clerk is directed to close this case.

**DONE** and **ORDERED** in Tampa, Florida on August 31, 2009.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
The Honorable Michael G. Williamson (U. S. Bankruptcy Court Case #8:08-mp-2-MGW)
Counsel/Parties of Record

F:\Docs\2009\09-cv-703.bk appeal.frm